**In re Robert Edward SPARROW and Linda Spinks Sparrow, Debtors.**

**E.L. Hamm & Associates, Inc., Plaintiff,**

v.

**Robert Edward Sparrow, Jr. and Linda Spinks Sparrow, Defendants.**

**Bankruptcy No. 02–53511–S. Adversary No. 03–5060.**

United States Bankruptcy Court, E.D. Virginia, Newport News Division.

Nov. 3, 2003.

Olaf F. Gebhart, Jr., Newport News, VA, for Debtors.

**818**

Michael P. Cotter, Vandeventer Black LLP, Norfolk, VA, for Plaintiff.

Jonathan L. Hauser, Troutman Sanders LLP, Virginia Beach, VA, for Defendants.

STEPHEN C. ST. JOHN, Bankruptcy Judge.

**Memorandum Opinion and Order**

This matter came on for hearing on September 5, 2003 upon the cross-motions for summary judgment pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure filed respectively by the plaintiff, E.L. Hamm & Associates, Inc., ("Hamm") and the debtor defendants, Robert Edward Sparrow, Jr. ("Robert Sparrow") and Linda Spinks Sparrow ("Linda Sparrow") (sometimes collectively "the Sparrows"). Upon consideration of the motions for summary judgment and the arguments of counsel, the Court makes the following conclusions of law.

## I

### Undisputed Facts

This adversary proceeding was initiated by the filing on March 14, 2002 by Hamm of a Complaint to Determine Dischargeability of Debt ("Complaint") against the Sparrows. The Sparrows initiated a petition pursuant to Chapter 7 of the United States Bankruptcy Code in this Court on December 4, 2002. The Complaint alleged that Robert Sparrow was indebted to Hamm in the amount of $14,500.00 and Linda Sparrow was indebted to Hamm in the amount of $1,500.00, which indebtedness arose as a result of fraud or defalcation while acting in a fiduciary capacity. Compl. ¶ 5. The Complaint further alleged that Hamm had been performing warehouse services for the United States Army at Ft. Eustis for nearly seventeen (17) years. ("Ft. Eustis Contract") Compl. ¶ 5(a). Linda Sparrow was employed by Hamm from October 1, 1985 to March 13, 2000, at which time she resigned. Compl. ¶ 5(b). The Complaint continues that Linda Sparrow served as the project manager for Hamm for the Ft. Eustis work, which position involved a high degree of trust. Compl. ¶ 5(c). Robert Sparrow was employed with Hamm from October 6, 1986 to December 11, 1998, when he resigned. Comp. ¶ 5(d). For approximately three and one-half years prior to his resignation, Robert Sparrow worked as the warehouse leader for the Ft. Eustis Contract performed by Hamm. *Id.* Hamm contends that in his position as warehouse leader, Robert Sparrow had significant contact with the Army and occupied a position of high trust. Compl. ¶ 5(e). Robert Sparrow was further alleged to have entered into a certain Professional Agreement dated October 6, 1998, which protected Hamm's legitimate business interests and its confidential and proprietary information. ("Professional Agreement") Compl. ¶ 5(f).

Hamm states that it became aware in March 1998 that the Army would solicit proposals for the Ft. Eustis warehousing work and Hamm decided to submit a proposal therefor and advised the Sparrows of its intentions. Compl. ¶ 5(g). The Sparrows signed an agreement with Hamm on March 20, 1998, wherein each agreed not to disclose any information to firms which might compete for the Ft. Eustis Contract. Compl. ¶ 5(h). Hamm alleged it learned of a number of actions taken by the Sparrows in breach of their fiduciary duties to Hamm. Compl. ¶ 5(i). These actions included assisting competitors of Hamm while in Hamm's employ, forming a corporation to compete with Hamm for the Ft. Eustis Contract, and agreeing with a competitor to join it in connection with obtaining the Ft. Eustis Contract. *Id.* Hamm filed a suit against the Sparrows and others, which suit asserted various causes of actions founded on breach of contract,

fraud and breaches of fiduciary duties ("State Court Action"). Compl. ¶¶ 6, 7. The State Court Action was tried by the Circuit Court of the City of Norfolk, Virginia, resulting in a Final Decree and a Supplemental Final Decree. Compl. ¶¶ 8, 9. Hamm finally alleged that the actions of the Sparrows constitute fraud or defalcation while acting in a fiduciary capacity within the meaning of 11 U.S.C. § 523(a)(4) and a willful and malicious injury to Hamm and its property pursuant to 11 U.S.C. § 523(a)(6). Compl. ¶ 10. Hamm prays that this Court declare the indebtedness of Robert Sparrow to it in the amount of $14,500.00 and the indebtedness to it of Linda Sparrow in the amount of $1,500.00 not discharged.

The Sparrows originally answered the Complaint on a *pro se* basis by a letter to this Court, disputing that Robert Sparrow was employed by Hamm beyond August 31, 1998, but otherwise not responding specifically to any of the other allegations of the Complaint. At the initial pretrial conference in this adversary proceeding conducted on May 9, 2003, counsel for the Sparrows appeared and advised of his recent retention by the Sparrows.[1] Counsel for the Sparrows requested and was granted leave to file an amended answer on their behalf, which amended pleading was filed with this Court on May 19, 2003.

The Amended Answer admitted the allegations of paragraphs 1, 2, 3, 4, 6, and 8 of the Complaint, while denying the principal allegations of Hamm of its entitlement that its judgment against the Sparrows respectively be found to be nondischargeable.

Both Hamm and the Sparrows have now moved for the entry of summary judgment pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

## II

### The Summary Judgment Motions

The Sparrows' Motion for Summary Judgment ("Sparrow Motion") relies entirely upon the findings of the State Court Action, arguing that Hamm is collaterally estopped from rearguing facts already decided there. Specifically, the Sparrows assert that "Hamm has already litigated in state court all the facts that could possibly give rise to any judgment that [the] debtors committed fraud, defalcation, or willful and malicious injury." Sparrow Mot., at 4. Believing that all the necessary elements required for the application of collateral estoppel are satisfied here, the Sparrows argue that there was no finding in the State Court Action that the Sparrows had a fiduciary relationship with Hamm for the purposes of § 523(a)(4) of the Bankruptcy Code. Furthermore, the Sparrows contend there was no finding of fraud or defalcation, as the debt resulting from the State Court Action was not founded on fraud or intentional deceit.

The Sparrows similarly believe the collateral estoppel effect of the State Court Action precludes a finding here that the debtors inflicted a willful and malicious injury pursuant to § 523(a)(6) of the Bankruptcy Code. While admitting the state court concluded they acted wrongfully, the Sparrows urge that nowhere in the judgment was it found the Sparrows intended to maliciously harm Hamm. Instead, the Sparrows believe the finding of the state court that they acted "with conscious dis-

---

1. Jonathan L. Hauser of the firm of Troutman Sanders LLP was retained by the Sparrows. Because this judge's law clerk, Katherine McNulty, had previously accepted future employment with the Troutman Sanders firm, she is recused from participation in this adversary proceeding and has not participated in the preparation of this Memorandum Opinion.

regard" is a "characterization which links the [Sparrows] to a level of culpability lesser than that of an intentional tort." Sparrows' Mot., at 11.

The Sparrows also specifically contest whether an element of the judgment entered against them in the State Court Action may be found to be non-dischargeable. They argue that the attorney fees portion of the state court judgment was awarded pursuant to the Professional Agreement entered into between Hamm and Robert Sparrow. This contractual nature of the attorney fees award therefore, according to the Sparrows, precludes a finding of non-dischargeability.

The motion for summary judgment of Hamm ("Hamm Motion") also relies upon the record of the State Court Action, but additionally directs this Court to deposition testimony of Robert Sparrow as supporting their right to entry of summary judgment here. First, Hamm argues that the Sparrows held "high-level supervisory positions and were entrusted with information and confidences not made available to other Hamm employees, including highly confidential and proprietary information regarding the Ft. Eustis Contract." Hamm Br., at 4. For these reasons, Hamm believes that, for the purposes of § 523(a)(4) of the Bankruptcy Code, the Sparrows were fiduciaries.

Hamm also argues that its debt should not be discharged under § 523(a)(6) of the Bankruptcy Code, citing to deposition testimony of Robert Sparrow wherein he admitted his lack of intention of adhering to the provisions of the "Loyalty Agreement" of March 20, 1998 and his transmittal of a Hamm document to a competitor. All of this, Hamm contends, proves the Sparrows' misconduct was undertaken with the knowledge that their actions would cause harm to Hamm.

In their respective responses to the motions for summary judgment, the Sparrows and Hamm each contest the others entitlement to an entry of summary judgment here. The Sparrows disparage the reliance by Hamm upon certain excerpts of the deposition of Robert Sparrow, contending that many of the facts suggested to be undisputed by Hamm are in material dispute by the Sparrows. Furthermore, the Sparrows assert the deposition excerpts relied upon by Hamm fail to support a conclusion that the Sparrows occupied a fiduciary relationship with Hamm or set forth facts constituting willful and malicious conduct on the Sparrows' part. The Sparrows additionally assert that the Hamm Motion is ambiguous as to whether it relies upon facts embodied in its underlying claims as attempted to be proven by the use of the depositions of the Sparrows or by the facts found in the State Court Action, or both.

Hamm protests that the Sparrows seek to limit this Court's inquiry merely to the four corners of the final decree issued in the State Court Action. Instead, Hamm contends the state court was not charged with the responsibility of making a determination of dischargeability. Therefore, this Court may consider the conduct of the Sparrows in the context of the application of bankruptcy law without offending the doctrine of collateral estoppel by relitigating specific facts or issues already decided in the State Court Action. Hamm also counters that the attorney fees awarded as part of the judgment in the State Court Action are nondischargeable if the underlying claims are found not to be discharged.

The centrality of the holdings of the State Court Action to resolution of these competing motions for summary judgment therefore command this Court to analyze in detail the claims asserted by Hamm in

the State Court Action and the findings and holdings there.

## III

## The State Court Action

Hamm filed its original Verified Bill of Complaint ("State Complaint") in the Circuit Court of the City of Norfolk, Virginia on April 14, 2000.[2] In addition to the Sparrows, the State Compliant listed as defendants Spirit Distributing Co. and Aquasis Services, Inc.[3] ("Aquasis").

The State Complaint explained that Hamm had performed warehousing services for the United States Army at Ft. Eustis for some years both as a prime contractor and as a subcontractor. State Compl., ¶ 5. Linda Sparrow served as project manager for Hamm at Ft. Eustis and had overall responsibility for Hamm's performance there. State Compl., ¶¶ 6, 7. Robert Sparrow was employed by Hamm for approximately three years, working as a warehouse leader for Hamm until his resignation in 1998. State Compl., ¶ 8. Hamm alleged that the Sparrows were made privy to confidential and proprietary information relating to the Ft. Eustis work and that Robert Sparrow entered into a "Professional Agreement" as a condition of his employment which, among other things, protected Hamm's confidential and proprietary information. State Compl., ¶¶ 10, 11.

Hamm, being advised that the Army would issue a solicitation for proposals to perform services at Ft. Eustis, decided to submit a proposal and on March 20, 1998, the Sparrows signed an agreement with Hamm permitting Hamm exclusive use of their names and resumes in the Hamm proposal and agreed not to release any information to any other firm initiating a proposal. State Compl., ¶¶ 12, 13. After cancellation of the initial solicitation, Hamm submitted a proposal and discussed the details thereof with the Sparrows. State Compl., ¶¶ 14–18. Aquasis also submitted a proposal for the Ft. Eustis work and Hamm subsequently learned that Linda Sparrow's resume had been included in this proposal as well as listing Robert Sparrow as a consultant or subcontractor. State Compl., ¶¶ 19, 21. Hamm then met with Linda Sparrow and inquired whether she had heard of Aquasis, which she denied then summarily resigned. State Compl., ¶ 21. Upon subsequent investigation, Hamm alleged it determined that the Sparrows assisted Aquasis and possibly other competitors in preparing a response to the Ft. Eustis solicitation and agreed to join with Aquasis in performing the Ft. Eustis work. State Compl., ¶ 22. Hamm also alleged that, while employed with Hamm, the Sparrows disclosed confidential information to Aquasis, and their acts were committed knowingly, willfully, maliciously and with reckless disregard for statutory, contractual and common-law duties owed to Hamm. State Compl., ¶¶ 23, 30.

Hamm sought injunctive relief and an award of damages based upon various legal theories. Count I of the State Complaint asserted a claim against Robert Sparrow founded upon his alleged breach of the Professional Agreement. Count II sought an award founded upon the alleged

2. The State Complaint is appended as an exhibit to the Hamm Motion and it is undisputed this exhibit is a true copy of the State Complaint of Hamm. The State Complaint described Spirit Distributing Co. as a Delaware corporation for which Linda Sparrow was president, Robert Sparrow was vice-president and CEO and both Sparrows are directors of Spirit Distributing Co.

3. Aquasis Services, Inc. was described as a Florida corporation in the business of performing storage and warehousing work for the federal government.

breach by the Sparrows of the March 20, 1998 Agreements by which the Sparrows permitted Hamm to list them as among the Hamm participants in the proposal of Hamm for the Ft. Eustis work. Count III alleged a violation by the Sparrows of Section 59.1–336, *et seq.* of the Code of Virginia, which prohibits misappropriation of a trade secret as defined therein. Count IV of the State Complaint alleged the commission of fraud by the Sparrows, specifically stating that at the time of the entry by the Sparrows into the March 20, 1998 Agreement with Hamm they had no present intent to perform their duties thereunder and accordingly their representations were false representations of a material fact made with the intent to mislead Hamm. Count V of the State Complaint alleged that the Sparrows had a duty of good faith, loyalty and honesty to Hamm, which duty was breached by them. Finally, Count VI alleged that the Sparrows, Spirit Distributing Company and Aquasis acted in a common law and statutory conspiracy for the purpose of interference with and the infliction of injury to Hamm. Hamm prayed for injunctive relief and the entry of judgment for its actual damages as well as an award of punitive damages and attorney fees.[4]

The claims of Hamm were adjudicated in a three day trial conducted in the Circuit Court of the City of Norfolk on May 7, 8 and 9, 2002. On August 9, 2002, the Chancellor, Judge Everett A. Martin ("Judge Martin") entered a final decree in the cause ("Final Decree"). The Final Decree, in pertinent part as to the Sparrows, found as follows:

1. That the plaintiff has proved a duty and breach of duty for these causes of action by the appropriate burden of proof: breach of contract, misappropria-

tion of trade secrets, fraud, and statutory and common law conspiracy; however, the Court also finds as a matter of fact that the plaintiff has not proved that the breaches of duty alleged were a proximate cause of the damages claimed; and, further, that many of the damages claimed are speculative.

2. That the plaintiff has proved Robert E. Sparrow, Linda S. Sparrow, and Andrew L. Hale breached their duty of loyalty to the plaintiff and that the plaintiff suffered damages from this breach in the amount of the compensation paid to these defendants while they were working against its interests. The plaintiff estimates these damages to be $5,600. (Plaintiff's Post–Trial Brief at pg. 17). The Court finds that from the evidence it can make a reasonable estimate of these damages.

3. That in breaching their duty of loyalty Robert E. Sparrow, Linda S. Sparrow, and Andrew L. Hale acted with conscious disregard of the plaintiff's rights; and further that Robert E. Sparrow, Linda S. Sparrow, and Andrew L. Hale are persons of modest means and limited opportunity.

Final Decree, ¶¶ 1–3. Judge Martin assessed damages against Robert Sparrow in the amount of Four Thousand Dollars ($4,000.00) for compensatory damages and Two Thousand Dollars ($2,000.00) for punitive damages. Damages were awarded against Linda Sparrow as well, with Judge Martin assessing One Thousand Dollars ($1,000.00) in compensatory damages and Five Hundred Dollars ($500.00) as punitive damages. Finally, Robert Sparrow was ordered to pay Hamm "Two Thousand Five Hundred Dollars ($2,500.00) in attorney's fees to [Hamm] under the Profes-

---

4. On August 17, 2001, Hamm filed an Amended Verified Bill of Complaint. This amended pleading added three new defendants and as-

serted claims against each. The allegations and claims against the Sparrows remained materially unchanged.

sional Agreement within six months of the entry of [the] decree." Final Decree, at 2, ¶ 4. Linda Sparrow was not ordered to pay any attorney fees to Hamm.[5]

Subsequently, on October 23, 2002, Judge Martin entered a Supplemental Final Decree in the State Court Action, which provided, in pertinent part:

> The Court having considered the submissions and arguments of the parties and the factors set forth in *Chawla v. BurgerBusters*, 255 Va. 616, 499 S.E.2d 829 (1998), it is hereby DECREED that the plaintiff recover from Robert E. Sparrow eight thousand five hundred dollars ($8,500.00) in total in attorney's fees pursuant to the Professional Agreement within six (6) months of the entry of this decree.[6]

Supp. Final Decree, at 1. Thus, in summary, the award of compensatory and punitive damages in the State Court Action appears to be founded upon Judge Martin's conclusion that the Sparrows breached a common law duty of loyalty owed to Hamm. In contrast, the various other theories of liability such as breach of contract, misappropriation of trade secrets, fraud and statutory and common law conspiracy were found to have been proven but Hamm failed to prove that the damages claimed under these theories were proximately caused by these breaches and further that many of the damages so claimed were speculative. The award of attorney fees by Judge Martin appear to be founded solely upon the provisions of the Professional Agreement entered into by Hamm and Robert Sparrow. It remains then to analyze whether the findings in the State Court Action are conclusive under the principles of collateral estoppel to resolve the instant matter.

## IV

### CONCLUSIONS OF LAW

 One of the most important benefits of the Bankruptcy Code is its ability to offer a debtor a fresh start. This concept of a fresh start demands courts construe exceptions to discharge narrowly. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir.1999)(citing *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994)); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1016 (Bankr.N.D.Ill.1996)(citing *Mayer v. Spanel Int'l., Ltd.*, 51 F.3d 670, 674 (7th Cir.1995)). Courts balance this belief with the principle "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)). The exceptions at issue in this case arise under § 523, which makes debts non-dischargeable:

> "(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; ...
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;"

11 U.S.C. §§ 523(a)(4), and 523(a)(6) (2002). Under Bankruptcy Rule 4005, the plaintiff has the burden of proof to make a debt non-dischargeable. Under § 523(a), the plaintiff must prove non-dischargeability by a preponderance of the evidence.

---

5. The Final Decree also enjoined the Sparrows from bidding upon or participating in the preparation of any bid for the Ft. Eustis work for a period of five years.

6. It is unclear from the Supplemental Final Decree whether Judge Martin intended the $8,500.00 in attorney's fees awarded there to be in addition to the $2,500.0 awarded in attorney's fees in the Final Decree, but the parties have stipulated their belief that the $8,500.00 award is the total intended amount awarded for attorney's fees by Judge Martin.

*Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Farouki v. Emirates Bank Int'l., Ltd.,* 14 F.3d 244, 249 (4th Cir.1994); *Combs v. Richardson,* 838 F.2d 112 (4th Cir.1988); *Whitson v. Middleton (In re Middleton),* 100 B.R. 814, 818 (Bankr.E.D.Va.1988). Therefore, Hamm must prove by a preponderance of the evidence whether any of these provisions of § 523 apply to the case at issue.

## A. Summary Judgment

In determining whether to grant summary judgment to a moving party, the Court looks to Rule 56(c) of the Federal Rules of Civil Procedure Rule which is made applicable to this proceeding by Federal Bankruptcy Rule 7056. Fed. R. Bankr P. 7056. Under Rule 56, the Court will grant summary judgment if two elements are proven. First, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The second requirement is that "the moving party is entitled to judgment as a matter of law." *Id.*

"The burden of establishing the nonexistence of a genuine issue of material fact rests on the moving party" and is proved by a preponderance of the evidence. *Maryland Highways Contractors v. State of Md.,* 933 F.2d 1246, 1252 (4th Cir.1991); *In re Speaks,* 193 B.R. 436, 440 (Bankr.E.D.Va.1995)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985)). "In considering a motion for summary judgment, the Court should draw all inferences from the underlying facts in a light most favorable to the nonmoving party." *In re Speaks,* 193 B.R. at 440 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

In determining whether to grant summary judgment, the Court is presented with several interpretations of the Rule 56 elements. With respect to the first element that there not be a genuine issue of material fact, the Supreme Court has defined a "material fact" as one that might affect the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). With respect to the second requirement that the moving party be "entitled to judgment as a matter of law," there are several threshold standards. A Complaint will not be dismissed via a granting of summary judgment unless the defendants "can prove no set of facts in support of [the trustee's] claim that would entitle [them] to relief." *Id.* (citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, integral to the Court's summary judgment determination is that summary judgment can be granted only if "there can be but one reasonable conclusion as to the verdict." *In re Galeski Optical,* 169 B.R. 360, 362 (Bankr.E.D.Va.1994)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Also, the Court will not grant summary judgment if "reasonable minds could differ as to the import of the evidence." *Id.* ("If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.").

## B. Collateral Estoppel

### *Introduction*

 Collateral estoppel, also referred to as "issue preclusion," is a subset of the general doctrine of res judicata and applies where the second action between the same parties is based upon a different cause of action. *In re Lucas,* 186 B.R. 67, 69 (Bankr.E.D.Va.1995); *Glasco v. Ballard,* 249 Va. 61, 64, 452 S.E.2d 854, 855 (1995) ("the doctrine [of collateral estoppel] ap-

plies even where the subsequent proceeding involves a different claim for relief."). The important distinction between *res judicata* and collateral estoppel is that "res judicata forecloses all issues that could have been litigated previously" while "collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit.' " *In re Lucas,* 186 B.R. at 69, citing *Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). If proven, collateral estoppel will preclude the relitigation of a specific fact or issue that was decided in a prior final judgment which involved a different cause of action. *Reid v. Ayscue,* 246 Va. 454–455, 436 S.E.2d 439, 440 (1993) (citing *Bates v. Devers,* 214 Va. 667, 670–71, 202 S.E.2d 917, 920–21 (1974)).

■ The prevailing state case law with respect to collateral estoppel is represented by *TransDulles Center, Inc. v. Sharma,* 252 Va. 20, 472 S.E.2d 274 (1996). In stating that the "Virginia law on collateral estoppel is clear," the Virginia Supreme Court identified five elements necessary for collateral estoppel to apply *Id.,* 252 Va. at 22, 23, 472 S.E.2d at 275. First, the issue litigated must have been essential to the prior judgment. *Id.* Second, the prior action must have resulted in a valid and final judgment against the party sought to be precluded in the present action. *Id.* Third, the parties or privies in both the proceedings must be the same. *Id.* Fourth, there must be mutuality between the parties. *Id.* Finally, the factual issue litigated actually must have been litigated in the prior action. *Id.* As with *res judicata,* the defendants have the burden of proving by a preponderance of the evidence that the elements of collateral estoppel have been established. *Reid,* 246 Va. at 456–57, 436 S.E.2d at 440. This Court will consider each of these factors, reserving for last the critically contested factor of whether here the issues litigated in the Sate Court action are essential to the judgment.

### Valid and Final Judgment

■ The Virginia Supreme Court has stated that:

A plea of res judicata or estoppel of record may be successfully invoked upon a final judgment or decree of a court of inferior or limited jurisdiction, as well as upon the judgment or decree of a court of record of general jurisdiction, provided the inferior court had jurisdiction of the parties and of the subject matter.

*Petrus v. Robbins,* 196 Va. 322, 329, 83 S.E.2d 408, 412 (1954).

■ Here the decree entered by the Norfolk Circuit Court in the State Court Action on August 9, 2002 was labeled a "final decree." Furthermore, the last sentence of the decree states that "[t]his chancery suit shall be placed among the ended causes." In light of the guidance provided by *Petrus* and the language in the final decree, the Court concludes that the decree entered by the court on August 9, 2002 is a valid and final judgment. Therefore, this element of collateral estoppel has been satisfied.

### Same Parties or Privies

For collateral estoppel to apply, the parties or their privies must be the same in the matter before this Court as were before the Norfolk Circuit Court. *See TransDulles Center,* 252 Va. at 22, 472 S.E.2d at 275. Here it is unconverted that both the Sparrows were party defendants and Hamm was the party plaintiff in the State Court Action. Accordingly, this condition is satisfied.

### Mutuality

In Virginia, collateral estoppel requires mutuality.[7] *Norfolk & Western Ry. v. Bailey Lumber Co.*, 221 Va. 638, 640, 272 S.E.2d 217, 218 (1980); *Selected Risks Insurance Co. v. Dean*, 233 Va. 260, 264, 355 S.E.2d 579, 581 (1987)("this Court made a considered, unanimous decision to resist the so-called 'modern trend' and not to abrogate the mutuality requirement."). Mutuality means that a party is generally prevented from invoking the preclusive force of a judgment unless that party would have been bound had the prior litigation of the issue reached the opposite result. *TransDulles Center*, 252 Va. at 23, 472 S.E.2d at 275 (citing *Norfolk & Western Ry.*, 221 Va. at 640, 272 S.E.2d at 218).

The question of whether there is mutuality here is predetermined because the identical parties here were present as respectively party plaintiff and defendants in the State Court Action. Both parties are equally bound by the prior litigation and, therefore, the Court concludes that mutuality exists, and, consequently, this element of collateral estoppel has been established.

### Factual Issue Actually Litigated

"The factual issue sought to be litigated actually must have been litigated in the prior action." *TransDulles Center*, 252 Va. at 22, 472 S.E.2d at 275. Here there is no dispute that the factual issues determined in the State Court Action were decided by Judge Martin after their actual litigation. As the Final Decree so notes, the findings of the Final Decree were ar-rived at after three days of trial. Accordingly, it is apparent the factual issues contained in the Final Decree were arrived at after actual litigation by the Sparrows and Hamm in the State Court Action.

### Issue Essential to the Final Judgment: Collateral Estoppel and Determination of Non–Dischargeability.

As well illustrated from the lack of controversy as to the satisfaction of all the preceding considered elements of collateral estoppel, the sole contested consideration here is whether the "precise issue, which is the target of the collateral estoppel was essential to the prior judgment." Put plainly, the task of this Court is to conclude whether the factual findings of the State Court Action are sufficient to satisfy the elements of non-dischargeability pursuant to §§ 523(a)(4) and (6) of the Bankruptcy Code, or do such findings preclude a determination the judgment there is not discharged.

While *res judicata* cannot form the basis for a decision of non-dischargeability, collateral estoppel may apply to non-dischargeability proceedings. *Brown v. Felsen*, 442 U.S. at 139, n. 10, 99 S.Ct. 2205. In so concluding the Court reasoned:

> Whereas, *res judicata* forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually decided in a prior suit ... If in the course of adjudicating a state-law question, a state court should determine factual issues using standard identical to those of § 17 [of the Bankruptcy Act], then collateral estoppel, in the absence of countervail-

---

7. Mutuality is especially required when collateral estoppel is used "offensively." *Norfolk & Western Ry.*, 272 S.E.2d at 217. Offensive collateral estoppel is present when "the plaintiff, who was a stranger to the former litigation, seeks to preclude the defendant, a party to the prior action, from relitigating an issue defendant lost in the prior case." *Id.* Defensive collateral estoppel is present when "the defendant, a stranger to the prior proceeding, attempts to preclude the plaintiff, a party to the former proceeding, from relitigating an issue plaintiff lost in the earlier case." *Id.*

ing statutory policy, would bar relitigation of those issues in bankruptcy court. *Id.* See also *Grogan v. Garner,* 498 U.S. 279, 284–85 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755. ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).") The application of collateral estoppel is appropriate only "if the examination of the record of the earlier proceeding satisfied the bankruptcy court that the issue was raised and litigated and the resolution of the issue was essential to the verdict in the prior case." *Combs v. Richardson,* 838 F.2d at 114. Accordingly, we next must consider whether the record of the State Court Action is sufficient for this Court to conclude all the necessary factual elements for the denial of discharge of the Sparrows pursuant to §§ 523(a)(4) and 523(a)(6) were decided. We will initially examine the findings of the state court to determine if the record is sufficient to conclude whether the Sparrows were fiduciaries of Hamm and secondly if the record is sufficient for a determination of whether the Sparrows acted willfully and maliciously in causing injury to Hamm.

## C. Fraud Or Defalcation While Acting In A Fiduciary Capacity § 523(a)(4)

Hamm seeks to have this Court find the judgment in the State Court Action against the Sparrows not to be discharged, alleging § 523(a)(4) prohibits discharge of this indebtedness. Specifically, Hamm alleges that Linda Sparrow as Project Manager and Robert Sparrow as Warehouse Leader were fiduciaries to Hamm. Compl. ¶ 5(b)–5(f). Hamm further alleges the Sparrows breached their duty of loyalty while acting in a fiduciary capacity. Compl. ¶ ¶ 5, 6, 7, 9. Finally, Hamm alleges that the state court found the Sparrows breached their duty of loyalty, which actions constitute fraud or defalcation while

acting in a fiduciary capacity. Compl. ¶ 10.

Section 523 of the Bankruptcy Code prohibits the discharge of an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity. 11 U.S.C. § 523(a)(4) (2002). In order for Hamm to prevail under § 523(a)(4), it must prove (1) that the debt in issue arose while the Sparrows acted in a fiduciary capacity and (2) the debt arose from his fraud or defalcation. *Global Express Money Orders, Inc. v. Davis (In re Davis),* 262 B.R. 673, 681 (Bankr.E.D.Va. 2001). The term "fiduciary" is narrowly construed, and courts limit the term "fiduciary capacity" to actions by individuals under express or technical trusts that existed before the defalcation claim arose. *Id.* Accordingly, the exception from discharge applies "... only to a debt created by a person who was already a fiduciary when the debt was created." *Id.* (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934)) (citation omitted). Courts have long recognized this limitation on the scope of this provision to technical trusts. In *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), the Supreme Court considered whether a factor who retained his principal's money was a "fiduciary debtor" within the Bankruptcy Act of 1841. Holding that a factor was not a fiduciary, the Court delineated technical and implied trusts:

> If the act embrace[s] [a factor's] debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor,

and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

*Id.* at 208.

Following this general principal, the bankruptcy court of the Eastern District of Virginia is reticent to impose liability under § 523(a)(4) except in those instances where there was found an express trust in existence. *Compare In re Davis*, 262 B.R. at 683 (holding that a debtor acted in a fiduciary capacity to a creditor under a trust agreement by virtue of the debtor's position as a major shareholder, director and president, of corporate signatory to trust), *with Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 852 (Bankr.E.D.Va.1986) (holding the existence of a partnership does not *per se* create a fiduciary relationship within the meaning of § 523(a)(4)); *Commonwealth of Va. Comm'n of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 904 (Bankr.E.D.Va.1985) (holding no fiduciary relationship existed between state and debtors who failed to remit license proceeds because there was no intent to create a trust in state statutes); *Harmon v. Scott (In re Scott)*, 203 B.R. 590, 596 (Bankr.E.D.Va.1996) (paying in advance for services did not create any express trust); *Snap–On Tools Corp. v. Rigsby (In re Rigsby)*, 18 B.R. 518 (Bankr. E.D.Va.1982) (holding that consignment and dealer agreements between debtor and creditor did not create express trust); *Sager v. Lewis (In re Lewis)* 94 B.R. 406, 410 (Bankr.E.D.Va.1988) (incurring debt from defalcation of money by partner from partnership did not occur while acting in a fiduciary capacity); and *CBR, Inc. v. Naff (In re Naff)*, No. 96–21436–SCS, 1997 WL 1088126, at *13 (Bankr.E.D.Va. July 18, 1997) (holding that failure of a seller to pay over proceeds of sale to a lender secured by inventory does not constitute defalcation while acting in a fiduciary capacity).

■ Thus, in the Eastern District of Virginia, courts restrict the term "fiduciary" as used in § 523(a)(4) to "the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors and partners." *Sager*, 94 B.R. at 410. It appears the Fourth Circuit Court of Appeals has not weighed in on this distinction in any published decision. However, in two unpublished decisions, the Fourth Circuit has endorsed the notion that an express or technical trust must arise to impose liability under § 523(a)(4). *See (In re Kelley)*, 948 F.2d 1281 (4th Cir.1991) (unpublished table decision) (holding that since Virginia statute did not create a trust *res* or impose trust responsibilities, debtor who was president of company issuing defaulted securities was not in fiduciary relationship); and *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850 (4th Cir.1999)(unpublished table decision) (holding that "under this section [523(a)(4) ], a fiduciary is limited to instances involving express or technical trusts."); *But see Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266, 271 (4th Cir.2002) ("Based on the confluence of: (1) the [debtor's] personal guarantees to ARC [the creditor] of Sovereign Travel [the debtor's corporation] indebtedness; (2) the fact that Sovereign Travel's indebtedness arose from Sovereign Travel's breach of its fiduciary duty to ARC; (3) the fact that Sovereign Travel's breach of a fiduciary duty was brought about by the Ellison's personal conduct and (4) the fact that the Ellison's conduct amounted to a breach of their fiduciary duty to Sovereign Travel,

we conclude that the Ellison's indebtedness to ARC under the personal guarantees was from their defalcation while acting in a fiduciary capacity and therefore is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(4)").

Other courts within the Fourth Circuit, on occasion, have expanded the scope of circumstances where a fiduciary relationship was found to exist for the purposes of § 523(a)(4). In *McLean v. Hildebrand (In re Hildebrand)*, 230 B.R. 72 (Bankr.D.Md. 1999), a partner of an accounting firm allegedly performed work for his former clients without compensating the partnership. The partnership sought to bar discharge of the partner's obligation to pay over the proceeds realized from these accounting services. There the court held that Maryland state law created a trust duty upon a partner that is expressed and arises before any wrongful act and therefore supported imposition of a fiduciary duty under § 523(a)(4). *Id.* at 77.[8]

Courts in other jurisdictions impose a fiduciary duty where a corporate officer has improperly received compensation. This jurisprudence is especially true of the Fifth Circuit Court of Appeals, where courts often find partners and corporate officers are fiduciaries. *See Sheerin v.*

*Davis (In re Davis)*, 3 F.3d 113, 114 (5th Cir.1993) (holding that a corporate president who improperly took cash advances from the company was a fiduciary); *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 184 (5th Cir.1997) (holding a chapter 7 debtor's duties to the limited partners as partnership's general partner, made him fiduciary under § 523(a)(4)); *LSP Inv. P'ship. v. Bennett (In re Bennett)*, 989 F.2d 779, 782 (5th Cir.1993) (holding that a general partner of a limited partnership, who wrongfully charged the limited partners for partnership expenses, was a fiduciary). Other courts of appeals have held partners or corporate officers as fiduciaries for § 523(a)(4) purposes. In *In re Frain*, 230 F.3d 1014 (7th Cir.2000), shareholders of a closely held corporation sought to except from discharge an indebtedness owed to them by the debtor, who owned fifty percent (50%) of the shares of the corporation and was chief operating officer thereof. Upon the officer's filing of bankruptcy, the other shareholders sought to except from discharge certain loans owed to them, on the basis that the debtor had violated provisions of a shareholder agreement by making shareholder distributions prior to payment of the loans; thus, the debtor was a fiduciary and had

8. The applicable Maryland statute relied upon by the court provided as follows:

§ 9–404 Partner accountable as a fiduciary.

(A) Accounting required.—Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

(B) Applicability to estates of deceased partners.—This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner.

*In re Hildebrand*, 230 B.R. at 75–76(quoting Md.Code Ann. Corps & Ass'ns. § 9–404 (1996)). *See also Republic of Rwanda v. Uwimana*, 255 B.R. 669, 674 n. 6 (D.Md.2000) (holding that an ambassador occupies country's highest positions of trust and whose duties include management of courts funds, is a fiduciary for purposes of § 523(a)(4)); *Am. Honda Finance Corp. v. Francis*, 1993 WL 208236, at *3 (W.D.Va.1993) (holding that a debtor who was president of the company and who failed to remit proceeds of sale of inventoried motorcycles under "floor plan" financing arrangement, was a fiduciary to financing creditor).

committed a defalcation under § 523(a)(4). After noting its earlier definition that a fiduciary relationship under § 523(a)(4) is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendency over the latter." In *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994), the court concluded the substantial concentration of power under the corporate structure was sufficient to create a fiduciary duty on the part of the debtor for the purposes of § 523(a)(4):

> While the parties' access to knowledge and information may have been reasonably similar, the concentration of power was substantially one-sided. The shareholder's agreement was structured to give Frain [the debtor] ultimate power over both his own employment and the direction of the corporation. Frain's control over the day-to-day business of the corporation and ownership of 50% of the shares gave him significant freedom to run the corporation as he saw fit, including oversight of such items as salary and distributions of corporate cash flow. The only real limit to his power was the chance of deadlock; that is, if he voted his 50% one way and O'Shea and Schoenfeld [the plaintiff shareholders] voted their combined 50% the other, nothing would happen. A further reading of the thirty-plus-page contract discloses that "major decisions shall require the consent of the holders of seventy-five percent (75%) of the voting common shares" (with some decisions requiring 100%). The contract defined "major decisions" to include "all deci-

sions affecting the Corporation which are not in the ordinary course of business of the Corporation." So no major decisions can be made unless Frain agrees.

. . . . .

> In this case, a fiduciary relationship was created by the structure of the corporation under the shareholder agreement, which had given Frain a position of ascendancy under our case law. Frain argues that violations of a contract entered into by equals are not covered by § 523(a)(4). However, Frain had a pre-existing fiduciary obligation to O'Shea and Schoenfeld independent of any breach of contract. This is not a case where a fiduciary relationship was implied from a contract. *See Bennett*, 989 F.2d at 784 (§ 523(a)(4) does not cover fiduciary duty implied from contract). A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over O'Shea and Schoenfeld.

*Id.* at 1017–18. The Ninth Circuit Court of Appeals in *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir.1996) concluded that the trustee of a partner was a fiduciary to the other partners of the partnership who commingled that partner's investment with other funds. Looking to Arizona law, the court found Arizona statutory law imposes an express trust relationship and thus the trustee of a partner was a fiduciary under § 523(a)(4).[9] *Id.* at 1185. *See also Hall v.*

9. The Arizona statute relied upon by the Ninth Circuit Court of Appeals to find a fiduciary relationship provides as follows:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any

transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir.1996), *quoting A.R.S. § 29-221(A)*.

*Johann (In re Johann),* 125 B.R. 679, 681–82 (Bankr.M.D.Fla.1991) (holding that an officer of debtor-in-possession who paid himself compensation without court approval was fiduciary for § 523(a)(4)); *but see Driggs v. Black (In re Black),* 787 F.2d 503, 506–07 (10th Cir.1986) (applying Utah law, a corporate officer owes a duty to shareholders collectively and not to stockholders individually, precluding conclusion that majority shareholder was a fiduciary as to minority shareholder).

Other courts have concluded the general fiduciary duty owed to a corporation under state law is not sufficient, by itself, to impose fiduciary capacity for § 523(a)(4) bankruptcy purposes. See *Ploetner-Christian v. Miceli (In re Miceli),* 237 B.R. 510, 516 (Bankr.M.D.Fla.1999); *ProSports Mgmt. of the South, Inc. v. Jacobs (In re Jacobs),* 243 B.R. 836, 843 (Bankr. M.D.Fla.2000) (stating that "because Florida statutory and case law lack any provision that creates a trust relationship or finds a corporate officer to be a trustee over corporate assets, [the plaintiff] *ProSports* has failed to prove that [the debtor] was acting in a fiduciary capacity within the context of § 523(a)(4)"); *Holaday v. Seay (In re Seay),* 215 B.R. 780, 787 (10th Cir. BAP 1997) (stating "even though the Oklahoma state courts may approve of a general policy that creates a fiduciary duty between joint venturers, this policy is not sufficient to fulfill the Tenth Circuit's requirements of a common law trust for purposes of § 523(a)(4)"); and *Kayes v. Klippel (In re Klippel),* 183 B.R. 252, 260–61 (Bankr.D.Kan.1995) (holding that a general fiduciary duty of loyalty, good faith, and fair dealing of joint venturer under Kansas law insufficient to impose fiduciary duty under § 523(a)(4)).

This Court concluded similarly in *KMK Factoring, L.L.C. v. McKnew (In re McKnew),* 270 B.R. 593, 630 (Bankr. E.D.Va.2001), where the manager of a Virginia limited liability company was found not to be a fiduciary for the purposes of § 523(a)(4) of the Bankruptcy Code ("The Virginia [limited liability corporation] Act contains ... a provision mandating a subjective business judgment standard of conduct for a manager; however, transforming this provision into a § 523(a)(4) fiduciary relationship ... appears to this Court, absent a showing of additional special circumstances, contrary to the long lineage of decisions requiring existence of an express or technical trust relationship with an identifiable res to impose § 523(a)(4) liability.").

Other courts have concluded corporate officers or directors occupied a fiduciary relationship for purposes of § 523(a)(4). See *Flegel v. Burt & Assoc., P.C. (In re Kallmeyer),* 242 B.R. 492, 495 (9th Cir. BAP 1999) (interpreting Oregon trust fund doctrine, a director owed corporate creditors a fiduciary duty); *Cundy v. Woods (In re Woods),* 175 B.R. 78, 83 (Bankr. D.Colo.1994) (holding that joint venturers and management committee members have fiduciary obligations and "Colorado common law imposes upon corporate directors and officers a technical trust relationship similar to that of partners, such that corporate directors and officers also act in a fiduciary capacity within the meaning of § 523(a)(4)"); *Associated Grocers of Colo., Inc. v. Horton (In re Horton),* 152 B.R. 912, 915 (Bankr.S.D.Tex.1993) (holding members of cooperative grocery association had a fiduciary relationship with the association itself); *Assurance Sys. Corp. v. Jackson (In re Jackson),* 141 B.R. 909, 916–17 (Bankr.N.D.Tex.1992)(stating that officers and directors of corporation by transferring all corporate assets without stockholder approval were fiduciaries for purposes of § 523(a)(4)); *United Va. Bank v. Fussell (In re Fussell),* 15 B.R. 1016, 1020 (E.D.Va.1981)(holding that an

officer who misused his position as a corporate officer to obtain repayment of his personal loans in contravention of subrogation agreement with creditor committed fraud or defalcation within the meaning § 523(a)(4)). Here, of course, Hamm seeks to extend the scope of fiduciary relationship beyond officers, partners or joint venturers to the Sparrows who undisputably were mere employees of Hamm.

■ To determine the existence of a fiduciary relationship under § 523(a)(4), a court must apply federal law. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir.1996)(citing *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 & n. 2 (6th Cir.1982)). However, state law is relevant to this inquiry. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d at 251. Accordingly, an examination of the law of Virginia concerning the relationship of employees to their employer is appropriate to assist in the determination as to whether the Sparrows acted in a fiduciary capacity for § 523(a)(4) purposes.

■ Virginia decisions have long recognized that under the common law an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment. *Williams v. Dominion Technology Partners, L.L.C.*, 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003); *Horne v. Holley*, 167 Va. 234, 241, 188 S.E. 169, 172–73 (1936). Subsumed within this general duty of loyalty is the more specific duty that the employee not compete with his employer during his employment. *Williams*, 265 Va. at 289, 576 S.E.2d at 757 (citing *Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 247 Va. 240, 249, 440 S.E.2d 918, 923 (1994)). It is likewise long recognized in Virginia that an employee must not have "misappropriated trade secrets, misused confidential information, [or] solicited an

employer's clients or other employees prior to termination of employment." *Williams*, 265 Va. at 291, 576 S.E.2d at 758 (quoting *Feddeman & Co. v. Langan Assoc.*, 260 Va. 35, 42, 530 S.E.2d 668, 672 (2000)). It is against this template that this Court must conclude whether the Sparrows as employees of Hamm had a fiduciary relationship with Hamm under § 523(a)(4).

■ Despite the numerous decisions in other jurisdictions which have found a fiduciary duty arising from statutorily or common law imposed general fiduciary obligations, the consistent strictness of definition of fiduciary relationship previously exercised by the decisions of this Court directs today's conclusion. This Court's reticence to extend the imposition of a fiduciary relationship for the purposes of § 523(a)(4) beyond circumstances of pre-existing express or technical trusts continues throughout the case law of this district. This Court also finds persuasive the reasoning of those courts that eschewed the opportunity to transform generalized statutory duties of trust and fair dealing into the fiduciary relationship demanded by § 523(a)(4). Courts appear to have particularly declined to impose a fiduciary relationship pursuant to § 523(a)(4) of the Bankruptcy Code where an employee was alleged to have breached a general duty of loyalty.

Illustrative is *Chicago Midwest Credit Service Corp. v. Trovato (In re Trovato)*, 145 B.R. 575 (Bankr.N.D.Ill.1991). There it was alleged an employer was harmed by an employee's kickback scheme which created a nondischargeable claim under Illinois law. After noting that Illinois common law imposed a duty of loyalty on employees which forbad them from taking any action against the interests of their employer, the court concluded, even if a state law claim existed for a breach of the

duty of loyalty, nonetheless such a claim was not non-dischargeable:

> However, even if Chicago Midwest does have a valid state law clam against Trovato for breach of the duty of loyalty, it would still have to demonstrate that the claim was nondischargeable under the provisions of the Bankruptcy Code. Chicago Midwest has not done so. Agency is not the kind of "fiduciary capacity" that gives rise to nondischargeability under Section 523(a)(4) of the Code. *In re Twitchell,* 91 B.R. 961, 964–65 (D.Utah 1988) ("The term 'fiduciary capacity' as defined by federal law, applies only to technical trusts, express trusts, or statutorily imposed trusts and not to fiduciary relationships which arise from an equitable or implied trust or an agency relationship."); *In re Hutton,* 117 B.R. 1009 (Bankr.N.D.Okl.1990) (examining the historical background of Section 523(a)(4) in holding that a director and officer of a corporation does not act in a "fiduciary capacity" for purposes of dischargeability).

*Id.,* 145 B.R. at 580, 581. *See also Urological Group, Ltd. v. Petersen (In re Petersen),* 296 B.R. 766, 786 (Bankr.C.D.Ill. 2003) ("In general, an employee/employer relationship is insufficient to constitute a fiduciary relationship under Section 523(a)(4)").

Also exemplary is *Novartis Corp. v. Luppino (In re Luppino),* 221 B.R. 693 (Bankr.S.D.N.Y.1998), where a creditor employer sought a determination that a management level employee responsible for evaluating competing contractor bids was a fiduciary for the purposes of § 523(a)(4) of the Bankruptcy Code. The employer obtained judgment against the employee in state court for his participation in a commercial bribery scheme. Despite this determination, the employee was found not to be a fiduciary under § 523(a)(4):

> The precise issue presented is whether [the employee] was acting in a "fiduciary capacity" as Director of Data Processing at [the employer] during the period 1984 through October 1990.
>
> It is true that [the employee] was held liable on a state law cause of action for breach of fiduciary duty as an employee of [the employer]. The jury verdict and the judgment of the state court with respect to that state law claim are res judicata as between the parties and cannot be relitigated in this Court. But the concept of "fiduciary" under Section 523(a)(4) of the Bankruptcy Code is different form and narrower than analogous state law concepts. The meaning and scope of the term "fiduciary" under Section 523(a)(4) has been discussed at length in *In re Zoldan,* 221 B.R. 79 (Bankr.S.D.N.Y.1998), and reference is made to that decision for the views of this Court on the issue. The issue in *In re Zoldan* was whether a general partner acting in respect to partnership property could be deemed a fiduciary under Section 523(a)(4).
>
> The question here is whether Luppino as a management level employee was acting in a fiduciary capacity. Under applicable precedents, I conclude that he was not.

*Id.* at 699. *See also Solar Systems and Peripherals, Inc. v. Burress (In re Burress),* 245 B.R. 871, 877 (Bankr.D.Colo. 2000) (former employee against whom state court judgment was obtained for breach of duty of loyalty was not a fiduciary pursuant to § 23(a)(4)); and *Paine-Webber, Inc. v. Magisano (In re Magisano),* 228 B.R. 187, 191 (Bankr.S.D.Ohio 1998) ("The Minnesota District Court's order granting summary judgment to Paine Webber refers to breach of a fiduciary

duty between Magisano and Paine Webber ... Paine Webber has neither alleged nor proven the existence of the type of fiduciary relationship required to invoke 11 U.S.C. § 523(a)(4), and merely referring to the employee-employer relationship is insufficient").

This Court finds further support for this conclusion by reviewing the many decisions outside of this jurisdiction, which have relied upon specific statutory impositions of a trust relationship to impose a § 523(a)(4) fiduciary relationship. *See, e.g., In re Hildebrand,* 230 B.R. at 75–76. Here the record of the State Court Action and the allegations of Hamm make clear the sole basis for imposition of a fiduciary relationship pursuant to § 523(a)(4) of the Bankruptcy Code are the status of the Sparrows as employees occupying positions of trust and authority with Hamm. As such, the imposition of a fiduciary relationship here would unnecessarily stretch the long imposed restriction of limiting such a relationship to an express or technical trust. Accordingly, the record of the State Court Action is sufficient for this Court to determine no fiduciary relationship for the purposes of § 523(a)(4) of the Bankruptcy Code existed between the Sparrows and Hamm. Therefore the portion of the Complaint seeking a declaration that the judgment debt of the Sparrows is not discharged pursuant to § 523(a)(4) must be dismissed.

### D. Willful and Malicious Injury

### § 523(a)(6)

Hamm alleges that the Sparrows' conduct constituted wrongful acts which the Sparrows committed without just cause or excuse and with the intent to cause injury to Hamm. Specifically, Hamm alleges the Sparrows' breach of their duty of loyalty to Hamm found in the State Court Action was done willfully and maliciously so as to prohibit the discharge of the judgment entered against the Sparrows under § 523(a)(6) of the Bankruptcy Code.

Section 523(a)(6) prohibits discharge for an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (2002). In order to obtain a determination of nondischargeability under Code § 523(a)(6), a creditor must ultimately prove three elements; (1) the debtor caused an injury; (2) the debtor's actions were willful and (3) that the debtor's actions were malicious. *Glucona America, Inc. v. Ardisson (In re Ardisson),* 272 B.R. 346, 356 (Bankr.N.D.Ill.2001) (citing *KingVision Pay Per View, Ltd. v. DeMarco (In re DeMarco),* 240 B.R. 282, 287 (Bankr.N.D.Ill.1999)). The United States Supreme Court dramatically changed the landscape of § 523(a)(6) nondischargeability proceedings in its decision of *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Prior to *Geiger,* § 523(a)(6) encompassed a broad range of conduct. In *Branch Banking & Trust Co. of Va., Inc. v. Powers (In re Powers),* 227 B.R. 73 (Bankr.E.D.Va.1998), this Court explained the prior case law:

Courts focused on both the malice prong and the willful prong of § 523(a)(6). The word "willful" was defined as "a deliberate or intentional act which necessarily leads to injury." In proving intent prior to *Geiger,* the creditor was only required to show the debtor's act was intentional; there was no requirement to show that the injury was intended. When an act, such as conversion, was done intentionally and produced harm without just cause or excuse, it was willful and malicious for purposes of § 523(a)(6), without proof of a specific intent to injure. Intent to injure was established by showing that the debtor intentionally performed an act which

necessarily caused injury or that was certain to ca[u]se injury.

*Id.* at 74 (citations omitted). Thus, a debtor could not discharge under § 523(a)(6) any intentional act, which necessarily caused an injury, even if the debtor never intended the resulting injury.

*Geiger* substantively and dramatically changed this analysis. The defendant physician in *Geiger* attempted to treat a patient's injured foot. *Geiger*, 523 U.S. at 59, 118 S.Ct. 974. Notwithstanding existing medical protocols known to Geiger, he elected to prescribe oral penicillin to reduce the treatment cost, rather than prescribing intravenous penicillin. Later, Dr. Geiger discontinued treatment because he believed the infection had subsided. Sadly, the less effective treatment coupled with the subsequent withdrawal of any antibiotics failed to curtail infection and the patient's foot required amputation. *Id.* After a substantial award to the patient in a malpractice action against Geiger, Geiger filed bankruptcy. *Id.* at 59–60, 118 S.Ct. 974. The patient sought to except his judgment from discharge under § 523(a)(6). *Id.* at 60, 118 S.Ct. 974.

The Supreme Court concluded the language of § 523(a)(6) encompassed only acts done with the actual intent to cause injury, and not merely intentional acts that happen to cause injury:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.*, "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the

(a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

*Id.* at 61–62, 118 S.Ct. 974 (citing Restatement (Second) of Torts § 8A cmt. a (1964)). The Supreme Court feared acceptance of a more expansive interpretation of § 523(a)(6) would stretch the breadth of exceptions to discharge too far:

> The Kawaauhaus' more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act—for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic—could fit the description. A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."

*Id.* at 62, 118 S.Ct. 974 (citations omitted).

Decisions shortly after *Geiger* concluded that § 523(a)(6) required a showing of an intentional tort with a subjective standard of intent. *In re Powers*, 227 B.R. 73, decided by this Court, is illustrative. The debtor, Powers, obtained a loan from the plaintiff bank, and pledged his securities portfolio account maintained at a brokerage institution as collateral for the indebtedness. *Id.* at 74. Powers later obtained financing from a second bank to purchase a construction company, which required him to pledge the same securities. When Powers defaulted on the second loan, he delivered possession of the securities to

the second bank, who liquidated the account. The plaintiff sought to deny discharge of Powers' debt to the first bank under § 523(a)(6). This Court concluded the debt was dischargeable in light of *Geiger:*

> Likewise, this Court must apply a subjective standard of intent and determine whether the debtor, Stewart M. Powers, intended to cause injury to the plaintiff, BB & T, by delivering his Portfolio Account to First Union when BB & T had a prior security interest in the account. First, the Court must examine the intentional acts of the defendant. The defendant stipulated that he directed Paine Webber to deliver his Portfolio Account to First Union without advising BB & T. The defendant's transfer of funds was an intentional act done to subordinate the plaintiff's interest in the Portfolio Account to that of First Union. However, the debtor's intentional transfer of the plaintiff's collateral to First Union standing alone is not enough to satisfy the requirements of § 523(a)(6), when he asserted that the subordination would not injure BB & T's chances of being paid in full as he intended to pay its loan off over time. The debtor also expected to pay the First Union loan according to its terms which would have the effect of restoring the collateral to BB & T.

> . . . . .

> Clearly, the defendant's act of subordinating the plaintiff's interests in his Portfolio Account was an improper act, but the Court is bound by the subjective intent of the debtor in determining whether the injury to the plaintiff was intended. However, the defendant's intent was to pay the plaintiff the balance due it, even though he subordinated its interest to First Union.

*Id.* at 76–77, 118 S.Ct. 974; *see also Roumeliotis v. Popa (In re Popa),* 140 F.3d 317, 318 (1st Cir.1998) (holding that although an employer's failure to carry worker's compensation insurance was an intentional act that caused injury, it was not done with the actual intent to cause the injury and therefore was dischargeable); *Fla. Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson),* 220 B.R. 134, 137 (Bankr.M.D.Fla.1998) (holding that the debtor's failure to turn over inventory proceeds pledged to a creditor to keep the business operative was not an intentional act to cause injury under § 523(a)(6)).

A subsequent case decided by the Fifth Circuit Court of Appeals advocated a slight erosion in this standard. In *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598 (5th Cir.1998), *cert. denied,* 526 U.S. 1016, 119 S.Ct. 1249, 1250, 143 L.Ed.2d 347 (1999), the court found the label " 'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury." *Id.* at 603. Instead, the court concluded that "either objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful injury' in § 523(a)(6)." *Id.; See also Williams v. International Brotherhood of Electrical Workers,* 337 F.3d 504, 509 (5th Cir.2003); *Johnson v. Dade (In re Dade),* 296 B.R. 388, 392 (Bankr.E.D.Va. 2001) ("[F]or a debt to be excepted pursuant to § 523(a)(6), plaintiff must prove that debtor caused a deliberate or intentional and malicious injury, or that debtor committed a deliberate or intentional act that was substantially certain to result in a deliberate or intentional or malicious injury"). *Accord, Baldwin v. Kilpatrick (In re Baldwin),* 245 B.R. 131, 136 (9th Cir. BAP 2000); *J. Bowers Constr. Co. v. Williams (In re Williams),* 233 B.R. 398, 405 (Bankr.N.D.Ohio 1999).

In an unpublished opinion, the Tenth Circuit Court of Appeals rejected the substantial certainty approach of the Fifth

Circuit, concluding that "the 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur." *Via Christi Reg'l. Med. Ctr., Inc. v. Englehart (In re Englehart),* No. 99–3339, 2000 WL 1275614, at *3 (10th Cir. Sept. 8, 2000); *See also Su v. Carrillo (In re Su),* 259 B.R. 909, 913 (9th Cir. BAP 2001) ("The key difference between the *Miller* and *Markowitz* holdings [of the Sixth Circuit] is that *Markowitz* followed the Restatement's requirement that the debtor *believe* that his actions will with substantial certainty cause injury, while in *Miller* the subjective belief of the debtor as to the certainty of the harm was not controlling.").

The decisions of the Circuit Courts subsequent to *Geiger* have scrutinized the debtor's knowledge or belief concerning the consequences of his actions. The Sixth Circuit Court of Appeals has articulated that "the mere fact that [the debtor] should have known his decisions and actions put [the creditor] at risk is also insufficient to establish a 'willful and malicious injury.'" *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 465 n. 10 (6th Cir.1999). The Ninth Circuit Court of Appeals has given consideration to the intent requirement post*Geiger.* In *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202 (9th Cir.2001), an employer withheld wages from an employee even though the employer possessed the funds to pay. The debtor argued, as had been held by the district court, that the employer must have withheld the wages with the "specific intent" of harming the employee. The Circuit Court disagreed:

> In *Geiger,* the Court did not answer the question before us today-the precise state of mind required to satisfy § 523(a)(6)'s "willful" standard. The

*Geiger* Court did, however, cite with approval its prior decision of *McIntyre v. Kavanaugh* and the Restatement (Second) of Torts § 8A.

In *McIntyre,* the debt arose from the debtor's conversion of the creditor's property. Holding that this debt was excepted from discharge under § 523(a)(6), the Court indicated that a wrongful act that is voluntarily committed with knowledge that the act is wrongful and will necessarily cause injury meets the "willful and malicious" standard of § 523(a)(6). Similarly, the Restatement definition of intent cited by the *Geiger* Court requires the actor either to desire the consequences of an act or to know the consequences are substantially certain to result. Under this definition, the actor's deliberate act with knowledge that the act is substantially certain to cause injury is sufficient to establish willful intent.

This definition is consistent with the approach this court took in the post-*Geiger* case of *In re Bailey,* where we stated that "[t]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6)."

We hold, consistent with the approaches taken by the Fifth and Sixth Circuits, that under *Geiger,* the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct. We believe that this holding comports with the purpose bankruptcy law's fundamental policy of granting discharges only to the honest but unfortunate debtor.

*Id.* at 1207–08. *See also Carrillo v. Su (In re Su),* 290 F.3d 1140, 1144 (9th Cir.2002) ("The holding in *In re Jercich* is clear: § 523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain"). Thus, we are confronted by a difference of interpretation between the various circuits in the aftermath of *Geiger,* with the critical distinction as to whether finding that a debtor was substantially certain that harm would occur is measured by a wholly subjective standard or an objective determination.[10] The Fourth Circuit Court of Appeals has not yet weighed in on this debate in a published opinion.

## Malice

▬ Since *Geiger,* the malice prong of § 523(a)(6) appears unchanged. As Judge Tice of this Court has explained:

Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. *See In re Stanley,* 66 F.3d at 667, *citing St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1008–09 (4th Cir.1985). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. *See In re Powers,* 227 B.R. at 73.

Debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circum-

stances. *See St. Paul Fire & Marine Ins. Co.,* 779 F.2d at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under … § 523(a)(6)."); *Hagan v. McNallen (In re McNallen),* 62 F.3d 619, 625 (4th Cir.1995). What is required is that plaintiff prove that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. *See In re Stanley,* 66 F.3d at 667.

*Johnson v. Davis (In re Davis),* 262 B.R. 663, 670–71 (Bankr.E.D.Va.2001).

The Fifth Circuit Court of Appeals has suggested that post-*Geiger* the test for willful behavior as well as malice are essentially combined into a single inquiry:

Turning to the meaning of "malicious," the *Miller [v. J.D. Abrams, Inc.]* court concluded Section 23(a)(6) creates an "implied malice standard." A debtor acts with implied malice when he acts "with the actual intent to cause injury." This definition of implied malice is identical to the *Kawaauhau* Court's explanation of willful injury. The test for wilful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists either an objective certainty of harm or a subjective motive to cause harm: on the part of the debtor.

*Williams,* 337 F.3d at 509, (quoting *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 605–606 (5th Cir.1998)).

## Analysis Of The "True Injury" Sustained By A Creditor

In reconciling the apparent diversion of various courts as to the objectivity or subjectivity of a debtor's intent to injure,

**10.** *See Carrillo v. Su (In re Su),* 290 F.3d 1140, 1143–1145 (9th Cir.2002) for an extensive dis-

cussion of the contrasting approaches of the 5th and 6th Circuits post-*Geiger.*

some courts have suggested that an analysis of what is the true injury experienced by the creditor is necessary. *ABF, Inc. v. Russell, (In re Russell)*, 262 B.R. 449, 454 (Bankr.N.D.Ind.2001). As Judge Stocks has explained:

> While a subjective intent to injure a creditor or its property certainly satisfies the willfulness requirement of § 523(a)(6), *Geiger* does not have to be read as requiring proof of subjective motivation to injure the creditor...[T]he key to applying *Geiger* is to accurately identify the creditor's true injury and to focus on that injury, as opposed to the resulting damage, when determining whether the injury was intentional.

. . . . .

The true injury in the present case is that proceeds from plaintiff's collateral were improperly disposed of when such proceeds were used for other purposes instead of being remitted to the plaintiff. The test of whether such improper use involved a willful injury is whether *Motorcars* intended to improperly use such proceeds for purposes other than the payment of the debt owed to the plaintiff. The debtor's state of mind is relevant to the extent that an intent to improperly use the proceeds depends upon the debtor having knowledge of the security interest in the automobiles and the requirement that proceeds from the automobiles be paid to the plaintiff. Where such knowledge exists, the unauthorized use or disposition cannot be considered innocent or merely technical.

*Community Savings Bank, Inc. v. Rountree (In re Rountree)*, 2002 WL 832669 at 6, 7 (Bankr.M.D.N.C.2002); *see also America First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 182 (Bankr.D.Utah 1999). This Court approved this analysis in the context of a conversion:

> It is of little consequence that McKnew [the debtor] probably did not intend his generosity to himself to cause as much financial harm to KMK [his employer] as resulted. McKnew doubtlessly all the while hoped KMK would survive despite his stripping it of substantially more monies than the agreement authorized, if for no other reason than to continue to supply his excessive financial needs.

> It is not necessary to conclude McKnew intended to almost fatally disable KMK by his excessive payments to himself. As the true injury suffered by KMK was McKnew's permanent removal of the monies to which he had no right or entitlement, McKnew's specific intent to cause injury must only reach this result.

*McKnew*, 270 B.R. at 642. An explanation of the nature of the breach of the fiduciary duty of loyalty of an employee is necessary to properly analyze this critical issue of discerning whether the requisite intent to injure on the part of the Sparrows may be found here.

### Duty of Loyalty

As aforedescribed, Judge Martin found the sole basis for assessment of damages against the Sparrows in the State Court Action was their breach of their duty of loyalty as employees of Hamm. The duty of loyalty of an employee appears to be long recognized in Virginia. *See Ferguson v. Gooch*, 94 Va. 1, 26 S.E. 397, 400 (1896) ("To be secretly in the service of the opposite party, while the agent is acting ostensibly for the principal only, is a fraud upon the latter, and a breach of the public morals which the law will not permit"). As the Virginia Supreme Court later observed,

> It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The

very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto* * * This is a rule of common sense and honesty as well as of law.

*Horne*, 167 Va. at 234, 241, 188 S.E. at 172 (quoting 2 Am.Jur. (Agency), Section 252, p. 203).[11]

The Restatement of Agency has also long recognized a general duty of loyalty on the part of an agent/employee: "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency, § 387 (1958). The Restatement of Agency has also recognized specific components of the duty of loyalty, including non-competitor and use of confidential information.

> Unless otherwise agreed, an agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which he agent is employed.

. . . . .

> Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not re-

---

**11.** It is not clear from Virginia caselaw whether a breach of the duty of loyalty is a tort or is a breach of an implied condition of employment of an employee. The Fourth Circuit Court of Appeals has considered this in the context of the law of North Carolina and South Carolina, finding three circumstances where disloyal conduct was considered fortuitous: (1) when an employee directly competes with his employer, (2) misappropriation of business opportunities or profits; and (3) when an employee breaches his employer's confidences. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 515 (4th Cir. 1999). Ironically, the accusations of Hamm in the State Complaint touch each of these circumstances. Initially the award of punitive damages appears to suggest Judge Martin considered the breach of the duty of loyalty to lie in tort rather than contract. However, while punitive damages in Virginia are generally not available in an action for breach of an ordinary contract, punitive damages may be awarded in "exceptional cases where the breach amounts to an independent, willful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness or oppression." *Wright v. Everett*, 197 Va. 608, 615, 90 S.E.2d 855, 860 (1956). *See also Kamlar Corp. v. Haley*, 224 Va. 699, 707 299 S.E.2d 514, 518 (1983) ("We adhere to the rule of *Wright v. Everett* in requiring proof of an independent, willful tort, beyond the mere breach of a duty imposed by contract as a predicate for an award of punitive damages, regardless of the motives underlying the breach.") Some courts have found whether a breach is characterized as a tort or a breach of contract is not material under § 523(a)(6), as a breach of contract may involve an intentional injury. *See Williams v. International Brotherhood of Electrical Workers*, 337 F.3d 504, 510 (5th Cir. 2003) (*citing Texas v. Walker*, 142 F.3d 813, 823 (5th Cir.1998); *Miller v. J.D. Abrams, Inc. (In re Abrams)*, 156 F.3d 598, 606 (5th Cir. 1998); and *Petralia v. Jercich*, 238 F.3d 1202 (9th Cir.2001) *cert. denied.*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001)) ("[a]lthough § 523(a)(6) *generally* applies to torts rather than to contracts and an intentional breach of contract *generally* will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6).")

late to the transaction in which he is then employed, unless the information is a matter of general knowledge.

*Id.* at §§ 394, 395.

■ Damages for a breach of the duty of loyalty of an employee may be compensatory or punitive or both. The Restatement of Agency makes it plain that a willful or deliberate breach of a duty of loyalty disqualifies the agent from any compensation:

> An agent is entitled to no compensation for conduct which is disobedient o which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

*Id.* at § 469.

■ The award of punitive damages against the Sparrows in the State Court Action also necessitates a review of the circumstances required under Virginia law to justify such an assessment. In Virginia an award of punitive damages is warranted by malicious conduct or negligence which is willful or wanton as to evince a conscious disregard of the rights of others. *Booth v. Robertson,* 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988). Furthermore, in Virginia "[w]illful or wanton conduct imports knowledge and consciousness that injury will result from act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." *Infant C. v. Boy Scouts of Am., Inc.,* 239 Va. 572, 580–581, 391 S.E.2d 322,

327 (1990)(quoting *Friedman v. Jordan,* 166 Va. 65, 68, 184 S.E. 186, 187 (1936)).

### Duty of Loyalty And § 523(a)(6)

Relatively few decisions have considered a breach of an employee's duty of loyalty in the context of the requirements of *Geiger*.[12] Two decisions aptly illustrate the difficulties of such an endeavor. In *Novartis Corp.,* 221 B.R. at 698 a debtor had previously suffered a judgment in the New York state courts, with a jury there finding Luppino liable to his former employee for having breached his duty of loyalty as an employee. After Luppino filed for relief in the bankruptcy court, the employer commenced an adversary proceeding contending its judgment was nondischargeable by reason of, among other grounds, § 523(a)(6). In moving for entry of summary judgment, the employer asserted that the finding by the state court of a breach of the duty of loyalty by Luppino was sufficient to establish by collateral estoppel the elements of a willful and malicious injury under § 523(a)(6). After noting that actual malice was required to be shown by the debtor the court summarized what it believed must be shown to prove actual malice on the part of a debtor:

> [T]he statutory element of maliciousness may be inferred from circumstantial evidence where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, where it is evident that the conduct will cause injury to the plaintiff and, most important, and under some additional, aggravating circumstance such as to warrant

<hr>

12. In addition to *Luppino* and *Sarff* discussed *infra,* certain decisions appear to have considered § 523(a)(6) after *Geiger* in the context of similar business torts or breaches. *See, e.g., Solar Sys. & Peripherals, Inc. v. Burress (In re Burress),* 245 B.R. 871, 880–81 (Bankr. D.Colo.2000) (misappropriation of business opportunity); *Read & Lundy, Inc. v. Brier (In re Brier),* 274 B.R. 37, 44, 45 (Bankr.D. Mass. 2002) (violation of Rhode Island Trade Secrets Act), and *Glucona America, Inc. v. Ardisson (In re Ardisson),* 272 B.R. 346, 357 (Bankr.N.D.Ill.2001) (misappropriation of trade secrets and unlawful competition).

an inference of malice and denial of discharge. An ordinary tort or breach of contractual or statutory duty generally is not sufficient to deny discharge under subsection (6) without some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the "fresh start" to which the "honest but unfortunate" debtor would normally be entitled under the Bankruptcy Code.

*Id.* at 700. In analyzing the underlying state court record, the court found it wanting to prove the actual malice prong:

> Applying the analysis set forth in *Kawaauhau, Stelluti* and *Blankfort,* I do not find any factual predicate to hold Luppino's judgment indebtedness to [the employer] to be non-dischargeable under Section 523(a)(6). Acknowledging the deplorable nature of the conduct for which Luppino was held liable in the State Court Action, the test for non-dischargeability under Section 523(a)(6) is not greed or the gravity of misconduct, but actual malice. Actual malice (intent to inflict harm on [the employer]) was not a necessary element of the causes of action asserted by [the employer] against Luppino in the State Court Action. Even if the receipt of commercial bribes and betrayal of state law duties of employee loyalty could be said to necessarily inflict economic damage on an employer (a proposition contested by Luppino), the creditor must allege and prove additional aggravating facts and circumstances sufficient to give rise to an inference of actual malice under *Stelluti* and *Blankfort,* and no such additional, aggravating facts and circumstances beyond the underlying causes of action are alleged by [the employer] in this adversary proceeding.

*Id.* The assessment of punitive damages in the state court matter was also relied upon by the employer as proof the jury there had made a finding of actual malice. This motion was also dismissed by the court as insufficient to collaterally estop the debtor:

> [The employer] argues that in order to impose punitive damages, the jury necessarily had to find that Luppino's breach of fiduciary duty of loyalty was "wanton and reckless or malicious" under New York law, citing *Camillo v. Olympia & York Prop. Co.,* 157 A.D.2d 34, 554 N.Y.S.2d 532 (1st Dep't 1990). First, nothing in the state court justice's jury instructions has been called to this Court's attention which would support the conclusion that the jury had to make a finding of malice in order to impose punitive damages under New York law. Second, [the employer's] articulation of malice may or may not be an accurate statement of state law, but it does not accord with the requirements of a showing of malice under Section 523(a)(6) of the Bankruptcy Code as articulated by the Supreme Court, the Second Circuit and this Court in *Kawaauhau, Stelluti* and *Blankfort.*

*Id.,* 221 B.R. at 700–701.

Subsequent to the *Luppino* decision, the Bankruptcy Appellate Panel of the Sixth Circuit considered *The Spring Works, Inc. v. Sarff (In re Sarff),* 242 B.R. 620 (6th Cir. BAP 2000). There a state court awarded damages against Sarff in favor of his former employer for, among other theories of recovery, a breach of Sarff's duty of loyalty as an employee.[13] Challenging the dischargeability of its judgment after Sarff filed for relief, Sarff and his former employer each moved for summary judgment. The bankruptcy court concluded

---

**13.** The state court in *Sarff* made a separate damage award in favor of the former employer of compensatory damages in the amount of $38,708.22 for breach of the duty of loyalty.

the award for compensatory damages for the breach of the duty of loyalty was dischargeable but the remainder of the judgment was not discharged under § 523(a)(6) of the Bankruptcy Code.

Sarff relied heavily upon *Luppino* in his assertion he had not been shown to inflict a willful and malicious injury on his then employer. The Bankruptcy Appellate Panel found *Luppino* did not support Sarff's position:

> Although Sarff relies on *Luppino* in this appeal, it does not support his position. In the present case, the state court made factual findings which warrant the inference of malice required for a finding that the debt is nondischargeable under § 523(a)(6). Unlike *Luppino*, the present case does involve wrongful taking because the state court found that Sarff took both springs and customers from his employer. Furthermore some of the punitive damages required malice as an element. Finally, like *Blankfort*, this case involves continuing violations of an injunction.

*Id.* at 627. The court then concluded that the findings of the state court were sufficient to prove the nondischargeability of the compensatory damages awarded for the breach by Sarff of his duty of loyalty:

> The magistrate awarded compensatory damages based on her previous findings that Sarff's actions were a willful and deliberate breach of his contract of service. Those actions indicate an intention to cause Spring Works economic injury by taking customers from Spring Works Accordingly, the compensatory damage award in the judgment is nondischargeable under § 523(a)(6). The part of the bankruptcy courts order finding the compensatory damages for breach of the duty dischargeable is reversed.

*Id.* at 628.

 In assessing the case at bar against this template, the brevity of the record of the State Court Action leaves a difficult decision for this Court. The totality of the underlying record now under consideration consists only of the State Complaint and the Final Decree and Supplemental Final Decree. The findings contained within this record are concise, with the relevant passages of the Final Decree consuming but two sentences: "That the plaintiff has proved Robert E. Sparrow [and] Linda S. Sparrow...breached their duty of loyalty to the plaintiff...while they were working against its interests" and "[t]hat in breaching their duty of loyalty, Robert E. Sparrow [and] Linda S. Sparrow...acted with conscious disregard of the plaintiff's rights." Final Decree, ¶¶ 2, 3. The question obviously becomes for this Court, are these findings sufficient for the conclusion the Sparrows violated the provisions of § 523(a)(6) by causing a willful and malicious injury upon Hamm? More specifically, do these findings convince the Court that the breach of the duty of loyalty by the Sparrows was intentional (as opposed to reckless or grossly negligent) and that the injury to Hamm was intentional or substantially certain to occur?

The difficulty arises here because the findings of the State Court Action are so sparse. There is no exhibited transcript and no underlying findings of fact were listed by Judge Martin. Instead, we must consider only the conclusory finding that the Sparrows breached their duty of loyalty with a conscious disregard of the rights of Hamm and the fact the state court elected to award punitive damages against the Sparrows.

It appears to this Court that the announcement by Judge Martin of the finding that the Sparrows acted in conscious disregard of the rights of Hamm was for the purpose of supporting the assessment

of punitive damages. While an award of punitive damages has often been a basis to conclude the § 523(a)(6) standards have been satisfied in other jurisdictions, and particularly so pre-*Geiger,* this assessment of punitive damages in a Virginia state court is not necessarily conclusive that "willful" behavior has occurred. Illustrative is this Court's decision by Judge Tice in *Johnson v. Dade (In re Dade),* 296 B.R. 388 (Bankr.E.D.Va.2001). There a creditor obtained judgment against a debtor for punitive damages, and argued this award constituted a collateral estoppel on the issue of whether the debtor had committed a willful and malicious injury.[14] The finding was not sufficient to require a finding of willful behavior under § 523(a)(6):

> The punitive damage award of $30,000.00 was based on a finding that the defendant acted "under circumstances amounting to willful and wanton disregard of the plaintiff's rights." [W]illful and malicious injury is a federal issue. This court holds that the punitive

damage instruction does not equate to a finding by the jury that defendant caused a deliberate or intentional injury to plaintiff as required by *Geiger.* Furthermore, the jury instruction did not necessarily require a finding that defendant committed an intentional act that was substantially certain to result in an injury.

*Id.* at 393 (citation omitted).

Virginia caselaw makes it plain that an award of punitive damages is warranted by malicious conduct *or* negligence which is willful or wanton as to evince a conscious disregard of the rights of others. *Booth v. Robertson,* 236 Va. at 273, 374 S.E.2d at 3. Furthermore, in Virginia proof of actual malice is not required to support a recovery of punitive damages. *Avocet Development Corp. v. The McLean Bank,* 234 Va. 658, 666, 364 S.E.2d 757, 762 (1988) (citing *Baker v. Marcus,* 201 Va. 905, 909, 114 S.E.2d 617, 621 (1960)).[15] Thus, while the

14. The state court jury was instructed as follows:

> If you believe that the plaintiff is entitled to be compensated for her damages and if you further believe by the greater weight of the evidence that the defendant acted with actual malice toward the plaintiff, or acted under circumstances amounting to willful and wanton disregard of the plaintiff's rights, then you may also award punitive damages to the plaintiff to punish the defendant for his actions and to serve as an example to prevent others from acting in a similar way. If you award punitive damages, you must sate separately in your verdict the amount you allow as compensatory damages and the amount you allow as punitive damages.

*Johnson v. Dade (In re Dade),* 296 B.R. 388, 392–393 (Bankr.E.D.Va.2001).

15. In contrast, *see Nestorio v. Associates Commercial Corp. (In re Nestorio),* 250 B.R. 50, 57–58 (D.Md.2000). There the debtor argued the district court finding of willful and malicious conduct was not necessary to the determination of liability in the underlying action

for which collateral estoppel effect was asserted. Noting that the issue of punitive damages was properly before the court in the underlying action, the court found:

> For the district court to award punitive damages in the prior action, it was required to find the Debtor acted with actual malice ... The findings necessary to award punitive damages under Maryland law are virtually identical to those required for the exception to discharge under § 523(a)(6). Therefore, in awarding punitive damages under Maryland law, it was necessary for the district court to find the debtor caused willful and malicious injury within the meaning of § 523(a)(6).

*Id. See also Combs v. Richardson,* 838 F.2d 112, 117 (4th Cir.1988) (where a trial court instructed a jury that "to find punitive damages in this case, it's necessary that you find that the Defendants not only committed assault but did so with malice," a verdict awarding punitive damages to the plaintiff had as an essential finding that "the defendant acted willfully and maliciously" as an essential pre-requisite to the award).

finding by Judge Martin of "a conscious disregard for the plaintiff's rights" provides ample justification for an award of punitive damages against the Sparrows, it does not, under Virginia law, compel the conclusion the acts of the Sparrows were willful, as required by § 523(a)(6).[16] The punitive damages could have been awarded by Judge Martin for gross negligence or recklessness, neither of which are sufficient under *Geiger.*[17]

■ However, despite the lack of conclusiveness of the award of punitive damages indicating that the Sparrows necessarily acted willfully (as opposed to recklessly or otherwise), is the nature of a finding the Sparrows breached their employee's duty of loyalty necessarily imply a conclusion that the Sparrows must have acted willfully? While by the very

nature of the breach, one imagines a breach of a duty of loyalty would typically be done with some level of willfulness and intention, the finding of a breach of a loyalty duty does not appear to preclude all but a finding of willful intention which equates to a Section 523(a)(6) violation. The Restatement of Agency, at least as to the assessment of the damages of a loss of an agent's compensation, appears to contemplate a distinction between a willful and deliberate breach of the duty of loyalty and a presumably non-willful breach. *See Restatement of Agency (Second), supra,* at § 469.[18]

Certainly, given the specific allegations of Hamm in the State Complaint of the misconduct of the Sparrows, it is difficult to contemplate that the conclusory finding of the breach of this employee fiduciary

16. In the State Complaint, Hamm alleged the actions complained of were "committed knowingly, willfully, maliciously and with reckless disregard for statutory, contractual and common-law duties" owed to [Hamm] by [the Sparrows] and that the Sparrows "acted with actual malice toward [Hamm] under circumstances amounting to a willful and wanton disregard of [Hamm's] rights, entitling [Hamm] to punitive damages." State Compl. ¶¶ 29, 30. Despite the inclusion of the "willful" element, the description of the activities of the Sparrows by Hamm only recite the language appearing throughout Virginia case-law describing circumstances justifying an assessment of punitive damages, which constitutes a much different issue than the willful and malicious conduct required to be shown under § 523(a)(6) of the Bankruptcy Code, especially post-*Geiger. See Johnson v. Dade (In re Dade),* 296 B.R. 388, 393 (Bankr. E.D.Va.2001).

17. Another court found an award of punitive damages by a Virginia state court to be inconclusive on the issue of § 523(a)(6). In *Bunn v. Cooper (In re Cooper),* 17 B.R. 733 (Bankr. D.Md.1982), Judge Mannes observed:

The standard for awarding punitive damages in Virginia is unclear. Actual malice will support an award. If there is no actual malice, courts have awarded punitive dam-

ages for other kinds of behavior that is equivalent to actual malice. The Fourth Circuit referred to conduct that is "in conscious disregard of the rights of others and is wanton and oppressive."

. . . . .

The varying language applied in these cases make it impossible for this Court to determine whether the standards applied by Judge Bryan in his decision not to award punitive damages are identical to that applied by a bankruptcy court in determining what constitutes an exception to discharge under 11 U.S.C. § 523(a)(6). Because these issues may not be identical, application of collateral estoppel by this court would be improper.

*Id.,* 17 B.R. at 734–35 (citations omitted). *But see York v. Shepherd (In re Shepherd),* 56 B.R. 218, 219 (W.D.Va.1985) (award of punitive damages in state court for intentional torts of assault and battery, false imprisonment and malicious prosecution necessitated a finding that conduct was willful and malicious).

18. At a minimum, the nature of the occurrence of a breach of the duty of employee loyalty is not such it may be said to be inherently an intentional tort (or breach of contract).

duty would be done by them other than on an intended basis. But the summary nature of the finding of the breach by Judge Martin does not on its face preclude any other basis for the breach except willful behavior. At this juncture of the instant proceeding, the Court must look only to the face of the findings of the State Court Action and not speculate or make a supposition beyond those actual findings. Further, the finding that the Sparrows acted with a conscious disregard for the rights of others under Virginia law does not compel a conclusion that the Sparrows necessarily acted willfully as required by § 523(a)(6) after *Geiger*. Had this Court the benefit of the thought processes which ultimately lead Judge Martin to his conclusions of the Final Decree, perhaps it is likely this Court could be spared the process of weighing the intent and exigent circumstances which led to the already determined loyalty breach here. However, the state court findings, while entirely complete for the purposes of adjudicating the entitlement of Hamm to damages against the Sparrows, nonetheless are not sufficiently preclusive for this Court to conclude the Sparrows acted in disregard of § 523(a)(6).[19]

Having decided the findings of the State Court Action are insufficient to support an award of summary judgment to Hamm, it is not axiomatic that the Sparrows accordingly are entitled to entry of summary judgment on the § 523(a)(6) theory of recovery. The Sparrows contend that, if the record of the State Court Action is not sufficient to award Hamm sum-

mary judgment, then this Court must find for the Sparrows "because all the facts pertinent to t his case were already litigated in the State Court." Sparrow's Mot. Summ. J. at 4. In other words, the Sparrows contend "Hamm has already litigated in state court all the facts that could possibly give rise to any judgment that Debtors committed fraud, defalcation[20] and malicious injury." *Id.* Thus, the absence of a sufficient finding by Judge Martin as to the willfulness of the injury inflicted according to the Sparrows prevents this Court from making its determination in this regard.

The Sparrows argument misstates the critical distinction between *res judicata* and collateral estoppel. Collateral estoppel prohibits the relitigation of the precise issue actually litigated between the same parties in a prior litigation. *In re Lucas,* 186 B.R. at 69 (citing *Brown v. Felsen,* 442 U.S. at 139 n. 10, 99 S.Ct. 2205). *Res judicata,* in contrast, precludes all issues which could have been litigated in a prior action. *Id.* While collateral estoppel may apply in dischargeability proceedings, the use of *res judicata* generally is limited. *Shadow Factory Films, Ltd., Co. v. Swilley (In re Swilley),* 295 B.R. 839, 845 (Bankr.D.S.C.2003).

The use of *res judicata* in circumstances of dischargeability actions was addressed by the Supreme Court in *Brown v. Felsen.* There the Supreme Court rejected the notion that bankruptcy courts must be confined to the state court record:

[W]e reject respondent's contention that *res judicata* applies here and we hold

---

19. In so concluding, this Court believes this matter more nearly resembles the circumstance of *Luppino* than those of *Sarff*. A reading of *Sarff* suggests the state finding of willfulness was more apparent than in the instant matter. The *Sarff* court's reliance on the state court's award of punitive damages is precluded here by the ambiguity of the law of

Virginia as to the requirement of willful behavior in the assessment of punitive damages.

20. This Court believes the underlying record of the State Court Action is sufficient to conclude there is no basis to find that the Sparrows, as employees of Hamm, were fiduciaries under § 523(a)(4), *infra.*

that the bankruptcy court is not confined to a review of the judgment and record in the prior state court proceedings when considering the dischargeability of respondent's debt. Adopting the rule respondent urges would take § 17 [now § 523] issues out of the bankruptcy courts well suited to adjudicate them, and force those issues onto state courts concerned with other matters, all for the sake of a repose the bankrupt has long since abandoned.

*Id.,* 442 U.S. at 138, 139, 99 S.Ct. 2205; *See also Combs v. Richardson,* 838 F.2d at 114–15.

The issue of whether the Sparrows inflicted a willful and malicious injury under

§ 523(a)(b) was simply not before the state court and the absence of such a finding does not preclude Hamm, as a matter of *res judicata,* from putting on proof regarding this at trial.[21] Accordingly, this issue of whether the breach of the duty of loyalty done by the Sparrows was undertaken willfully and maliciously so as to preclude discharge under § 523(a)(6) must proceed to trial.[22] Finally, because the Court is unable to resolve the issue by summary judgment of whether the judgment for compensatory damages entered in the State Court Action is not discharged by reason of § 523(a)(6), the Court by necessity must leave the issues of the dischargeability of the punitive damages and the attorney's fee for trial.[23]

**21.** The Court in *Brown v. Felsen* recognized the critical distinction between *res judicata* and collateral estoppel in a bankruptcy dischargeability context, writing that "[w]hereas *res judicata* forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions *actually and necessarily* decided in a prior suit." *Brown v. Felsen,* 442 U.S. at 139, n. 10, 99 S.Ct. 2205. (emphasis added).

**22.** The Court's inability to award summary judgment to either party on the § 523(a)(6) claim does not mean the claims and damages asserted in the State Court Action may be relitigated. These matters are subject to *res judicata* and the sole issue remaining to be decided is whether the judgment rendered in the State Court was caused by a willful and malicious injury under § 523(a)(6).

**23.** With respect to the dischargeability of the attorneys' fees awarded in the State Court Action, courts have applied three doctrines or theories to determine whether debtors may discharge their obligations to pay court-awarded attorneys' fees. *Merriex v. Beale (In re Beale),* 253 B.R. 644, 651 (Bankr.D.Md. 2000). Under the majority "Statutory/Contractual Basis" doctrine applied by the Second, Sixth, Ninth and Eleventh Circuits, fees may be determined non-dischargeable only where there originally existed some statutory

basis for the award. *Id.* A second line of authority falls under the "Status Dependent" doctrine, where the dischargeability of the ancillary obligations such as attorney's fees depends on the dischargeability of the underlying debt. *Id. See In re Sposa,* 31 B.R. 307 (Bankr.E.D.Va.1983). A third approach which is not relevant here is the "Support Context" doctrine, where fees awarded in connection with divorce or separation are not dischargeable. *Id.* Here this Court must await the resolution of discharge of the compensatory damages in order to properly adjudicate the issue of discharge of the attorney's fees. Complicating this decision is the consideration of whether the already decided contractual basis of the recovery of the attorney's fees will satisfy the § 523(a)(6) requirement in this jurisdiction. Courts have held an award of punitive damages is not discharged if the conduct giving rise to the award of punitive damages sprang from the same conduct giving rise to the compensatory damages. *Hagan v. McNallen (In re McNallen),* 62 F.3d 619, 627 (4th Cir.1995). Accordingly, this Court must determine if "both the punitive award and the compensatory award stemmed from the same willful and malicious injury." *Id.* (quoting *Johnson v. Miera (In re Miera),* 926 F.2d 741, 745 (8th Cir.1991)). Here the issues of discharge of the punitive damage award and the attorney's fees, like the compensatory damage award, are not ripe for summary disposition and must await the

## V

## Summary

The motion for summary judgment of Hamm for a declaration that the judgment entered in the State Court Action is not discharged pursuant to § 523(a)(4) is denied because the underlying record is sufficient to determine that, as employees of Hamm, the Sparrows are not fiduciaries. The motion for summary judgment of the Sparrows pursuant to § 523(a)(4) is partially granted in this respect. The findings of the State Court Action are not sufficient for this Court to rule the issue of willful injury under § 523(a)(6) was resolved there, which causes the Court to deny the motion for summary judgment of Hamm pursuant to § 523(a)(6). The doctrine of collateral estoppel does not preclude Hamm from attempting to prove at trial that the breach of the duty of loyalty found in the State Court Action was a willful and malicious injury pursuant to § 523(a)(6). Accordingly, the motion for summary judgment of the Sparrows pursuant to § 523(a)(6) is also denied.[24] The Clerk is directed to schedule a date for trial of the Complaint on the issue of whether the judgment rendered in the State Court Action is not discharged pursuant to 11 U.S.C. § 523(a)(6).

## Conclusion

For the reasons stated here, the Hamm Summary Judgment Motion is denied and the Sparrow Summary Judgment Motion is granted in part and denied in part.

It is so ORDERED.

It is further ORDERED that the Clerk shall send a copy of this Memorandum Opinion and Order to Jonathan L. Hauser, counsel for the Sparrows, and to Michael P. Cotter, counsel for Hamm.

---

presentation of evidence as to whether a willful and malicious injury has taken place pursuant to 11 U.S.C. § 523(a)(6).

24. In deciding the summary judgment motions here, the Court has relied solely upon the record of the State Court Action, consisting of the State Complaint and the Final Decree and Supplemental Final Decree. While Hamm has urged the Court to further rely upon the deposition excerpts cited in its summary judgment motion, the assertions by the Sparrows in their reply brief of the existence of disputed material facts convince the court that, since the record of the State Court Action is insufficient to establish the breach of § 523(a) by reason of collateral estoppel, this matter is not ripe for summary judgment on this issue which therefore must proceed to trial. While not necessarily reached here because of the insufficiency of the State Court Action record, the court believes it helpful to give guidance to the party's in one regard for their benefit at the upcoming trial. The Sparrows suggest this Court must find the Sparrows intended to inflict economic harm upon Hamm in order to find the judgment not discharged. This Court disagrees. As this Court did previously in *McKnew*, the true nature of the injury of a breach of an employees duty of loyalty must be considered. In this instance, the nature of the injury suffered by Hamm is the deprivation of the honest and *bona fide* efforts of the Sparrows as employees, which was measured by a forfeiture of the compensation the Sparrows received by Hamm. This Court does not believe it necessary for Hamm to prove that the Sparrows formulated an intent to economically harm their employer, but instead must prove the Sparrows intended to breach their duty of loyalty and did so with malice.